## C. F. MEACHAM v. THE SOUTHERN RAILWAY CO.

(Filed 19 November, 1908).

1. **Railroads—Duty of Employer—Negligence—Evidence Sufficient.**

   In an action for damages for personal injury, evidence of negligence is sufficient to take the case to the jury which tends to show, that, on a dark night, without the customary signal or warning, except the rumbling noise caused by its approach, an engine, which had been coupled to the train, but had gone for water, returning and making a coupling to the train, struck the train on a level track, with violence, the force being sufficient to drive the entire train of twenty-two cars back to the distance of from a car and a half to two-car lengths, just as the plaintiff, in the discharge of his duties as employee, was getting into the cab of his engine coupled at the other end of the train, thereby throwing him in front of his engine onto the track ahead, and causing the injury complained of.

2. **Railroads—Rule of Employer—Protection of Trains—Interpretation of Rules—Sidings.**

   A rule of the employer, a railroad company, to the effect that a flagman is directed to go back a given distance to the rear of his train and place torpedoes in certain places, "when a train is stopped at an unusual point, or is delayed at a regular stop-over three minutes, or when it fails to make its schedule time," is for the protection of trains when they are on the main line at an unusual place, or for an unusual length of time, and for the purpose of preventing injury by reason of other trains coming from the rear, and has no application to trains on a siding at a regular station, in no apparent danger.

3. **Same—Evidence—Nonsuit—Contributory Negligence.**

   Evidence tending to show that defendant railroad company negligently caused plaintiff to be thrown to the ground, and inflicted the injury complained of, while his train was on a siding at a regular station without apparent danger from approaching trains, and that he was acting under the instruction of his superiors in charge, or with their knowledge and approval, is not affected by the fact that he was not acting under a rule made for the protection of trains when on the main line, so as to raise the question of contributory negligence; and a judgment of nonsuit upon the evidence based on this contention is properly refused.

4. Rules of Employer—Interpretation—Parol Evidence—Rule Inapplicable.

Parol evidence tending to show that conditions had arisen in a particular instance so that a printed rule of employer did not apply, is not an interpretation of the rule by parol.

ACTION tried before *Cook, J.,* and a jury, at January Term, 1908, of McDowELL.

The action was to recover damages for personal injuries caused by the alleged negligence of the defendant company, and on issues submitted, the jury rendered the following verdict:

"1. Was the plaintiff, C. F. Meacham, injured by reason of the negligence of the defendants, as alleged in the complaint? Answer: 'Yes.'

"2. Did the plaintiff, C. F. Meacham, by his own negligence, contribute to his own injury? Answer: 'No.'

"3. What damages, if any, is the plaintiff entitled to recover? Answer: '$5,800.' "

There was judgment on the verdict for plaintiff, and defendant excepted and appealed.

*Pless & Winborne* for plaintiff.
*S. J. Ervin* for defendant.

HOKE, J. We are of opinion that no error was committed on the trial of this cause below, and that the judgment in favor of the plaintiff should be affirmed. The evidence tended to show, and the jury have found, that plaintiff, a flagman on a freight train of defendant company, has had his arm crushed so that it had to be amputated, and by reason of the culpable negligence of his co-employees in making a coupling of the engines to the train on which plaintiff was engaged, at the time of the injury, and that plaintiff himself is free from blame in the matter.

There was testimony to the effect that the train in question was a freight train of twenty-two cars, going from Spencer

to Asheville, and, at the time of the occurrence, had taken a
siding at Greenlee, N. C., to let No. 12, a passenger train,
pass, and had been upon the siding for some time before that
train went by. After No. 12 had passed, it was found that
the engine attached to the train was without sufficient water
and would have to proceed to Old Fort, a point on the road
about five miles further west, to get water. The engine was
detached from the train, pulling out on the main track some
distance ahead, and then backed down the main track to the
caboose in rear of the freight, where the conductor, Luther
Roper, and plaintiff then were. The engineer had also been
in the cab, as will be seen from this extract from the testi-
mony.

"Q. Which way was your train going? A. 'Going west.'

"Q. And standing on the side-track at Greenlee? A. 'Yes,
sir.'

"Q. No. 12 is a passenger train? A. 'Yes, sir; passenger
train that goes east. We were there some little time, and
while we were there I was busy making out daily reports
and time tickets, etc., and doing conductor's work, which it
was my duty to help him do, and after No. 12 passed the
engineer left the cab. He was in the cab before No. 12
passed, and after No. 12 passed he went back to the engine,
and in a few minutes he pulled down the main line, and said
he was out of water, and would have to go to Old Fort to
get water; and the conductor said: 'I believe I will go with
him.'

"Q. Who was the conductor? A. 'Luther Roper. He said:
'Meacham, hold everything until we get back.' He got on
the engine and went off.' "

After the engineer had gone up the track towards Old Fort,
the plaintiff went out to the rear of the caboose to be in a
position to carry out the order of the conductor, and plaintiff
testified: "After staying there awhile I sat down on the main
line rail for some time—on the north side of the main line

track. I just thought of a chair that was in the cab that we used for writing or a bunk or desk, or any way, there was a chair in the cab, and I went back in the cab and got the chair, and I sat in it between the side-track and the main line, and I set there for some time. I don't know how long, maybe forty, forty-five or fifty minutes, or maybe, not that long. It was pretty dark that night, and cloudy, and I heard a rumbling like a train coming." While plaintiff was in this position he heard a rumbling which he ascertained to be his engine returning, and witness then picked up his chair preparatory to getting into the cab, where it was his duty to be as soon as the coupling was made, so that the train could move off without delay. As the witness was in the act of mounting the steps with the chair in one hand, and had taken hold of the handle-bar with the other, without any signal or warning of any kind, the engine struck the train with great violence, the force being sufficient to drive the entire train of twenty-two cars back from a car and a half to two car lengths. By the force of the impact, the plaintiff was knocked loose from the car and on to the track in front of the train as it was then moving, and in the effort to save his life, his arm was run over and crushed as stated.

The negligence imputed to the defendant, on this testimony, and established by the verdict, was:

"1. In backing up to the train to make the coupling without giving a proper signal.

"2. By striking the train with unusual and unnecessary violence."

The evidence as to the first proposition is thus stated in the record, p. 20:

"Q. What signal did the engineer give before striking the train? A. 'None at all.'

"Q. What is the usual signal that he should have given?

"(Defendant objects).

"Q. What signal, according to the custom of the manage-

ment of trains? What was the usual signal to be given before striking a train to make a coupling?

"(Defendant objects).

"A. 'In backing in a train or just one car, it was the usual custom and it is the rule—

"(Defendant objects).

"Q. Just state the usual custom.

"(Defendant objects).

"A. 'It is usual to blow three short blows.'

"(Defendant objects).

"Mr. Erwin: This rule that you speak of, was this a printed or written rule? A. 'It is a printed rule.'

"Court: Do you know what the custom was? A. 'Yes, sir; certainly I do.'

"(Defendant objects).

"Mr. Erwin: The custom, you say, is embodied in a written rule? A. 'Yes, sir; engineer's rules.'

"Q. In a printed book of rules? A. 'Engineer's rules.'

"Q. It is in that book? A. 'I think I have seen it in this book.' "

And the statement already made is to the effect of the collision, when the coupling was made, in knocking the plaintiff's hold loose, and driving a train of twenty-two cars that unusual distance. There was the additional evidence on this point, to the effect that the track here was practically level, and that the movement of two or three cars at the front of the train was all that was required or should have taken place in making an ordinary or proper coupling.

It was not seriously contended on the argument, that the employees of defendant company were not negligent by reason of the manner in which the coupling was made, but it was earnestly urged that a nonsuit should have been directed, on the ground that the plaintiff was not where he had any right to be at the time, and was not there in proper discharge of his duty, and this chiefly by reason of a rule (No. 99) to the

effect, that a flagman is directed to go back a given distance
to the rear of his train and place torpedoes in certain places,
"when a train is stopped at an unusual point, or is delayed
at a regular stop-over three minutes, or when it fails to make
its schedule time."

It is claimed that if plaintiff had been acting in obedience
to this rule at the time, he would not have been in any position
of danger of any kind with reference to the coupling; and for
this reason, while the engineer may have been culpably negli-
gent in making the coupling, as a general proposition, he was
under no duty or obligation of any kind to the plaintiff. But
the Court is clearly of the opinion that the rule in question
has no bearing on the rights of these parties, and was never
intended to apply to the facts presented in this case; and for
this position, both the language and purpose of the rule itself,
and the objective facts and the testimony and conduct of all
the parties in reference to it, afford convincing reason.   The
rule was made for the protection of trains, and when they
were on the main line at an unusual place, or for an unusual
length of time, and for the purpose of preventing injury by
reason of other trains coming from the rear.   It was never
intended to apply when a train was on a siding and at a
regular station.   As said by plaintiff in his evidence, "My
train was not in danger from anything but robbery, it was
safe by reason of its being on the siding."   They had already
been on that siding when No. 12 passed going east, for more
than an hour, waiting, and yet the engineer, the conductor
and the flagman were all in the cab at that time, and no one
had pretended to go back in obedience to this rule.   But, it
was urged, that while this might be true as to the train, it
was not true as to the engine when it passed out of the siding
and on to the main line going towards Old Fort.   But the
rule is made for the government of trains and the crews
attached thereto.   It begins by saying, "when a train is
stopped," and in several places it says, "the flagman shall

go back a given distance to the rear of *his* train." If the plaintiff is to be made a part of the engine crew and charged with duties concerning it, because the engine had itself become a train, he should be allowed the distance he was behind the engine. There was certainly twenty-two cars ahead, and how much farther it was to the head of the switch when the engine entered on the main line, does not definitely appear, and it should not be presumed against him that it was within the prohibited distance. At Old Fort the plaintiff was five miles behind the engine, and assuredly, he was not required to follow along behind the engine, keeping at the specified distance. The truth is that this was an emergency to be dealt with by special orders of the plaintiff's superior, the conductor, and the proof shows that these orders were given and obeyed by plaintiff. The conduct of the parties show that they all so understood it, and it may be noted that this is not an interpretation of a rule by parol testimony. They are facts showing that conditions had arisen to which the rule did not apply.

When the engineer backed his engine down the main line to the cab, preparatory to going to Old Fort, and the conductor got aboard to go with him, he did not tell the flagman to go back and place torpedoes. The order was: "Meacham, hold everything till we get back." The track was straight for a half or three-quarters of a mile each way, and it was a safe order for the conductor to give. And when the engine returned, and just before it coupled, the evidence as to the plaintiff's duty is thus stated:

"Q. What did you do then? A. 'I began to prepare to get in the cab.'

"Q. How soon? A. 'Immediately.'

"Q. What was your duty when you saw that engine approaching? A. 'To prepare to be in the cab and to be ready to move when they got ready.'.

"Q. That was your duty? A. 'Yes, sir.'

"Q. How soon was it your duty to get ready? A. 'As soon as I could.'

"Q. When the first jolt was given to this train, did it knock you. loose? A. 'Yes, sir; that was what knocked me loose.' "

And he was carrying out this duty when he received his hurt. To show that the statement of plaintiff was true, when the coupling was made the train moved right off without any wait for a flagman, and without any signal given to "blow him in," which was always required when a flagman was properly in the rear guarding his train. The engineer, testifying for defendant, undertakes to explain this, by saying that the reason he did not blow, he saw, from the flagman's light, that he was at the rear of the train, and didn't need any signal. If this is true, then a duty arose to plaintiff even if he had been before that acting in violation of a rule. Defendant's engineer had no right to maim or kill him when he saw he was in a position where he would mount the cab as he did. A coupling made in the usual and proper manner would have caused no such result, and plaintiff was guilty of no negligence in getting into the cab as he did, certainly none was proved.

The correct explanation of the wrong done will, no doubt, be found in the fact, which appears in evidence, that when the engine of the train was at Old Fort, the engineer asked for and obtained the assistance of the "helper," a powerful engine which assists in pulling the trains over the steep mountain grades from Old Fort to Swannanoa Tunnell. These two engines were coupled together when they were backed against the train, and this is the reason, no doubt, of the tremendous force of that impact by which a train of twenty-two freight cars was driven back on a level track one and a half or two car lengths. We are of opinion that actionable negligence on the part of defendant company has been established in a trial free from error, and the rule urged for

defendant's exoneration is not properly available for the purpose.

Here is testimony where rule 99 did apply: "When the train moved off, after the coupling was made, and was about to enter on the main track, plaintiff sent a brakeman forward to notify the engineer that a flagman's arm was off, and he then turned to the dead-head conductor in the cab and said: 'Take your suspenders and cord my arm to stop its bleeding so, and take my light and light a fusee and go back and stop No. 75 from running into us.'" With his body maimed and his life wrecked, he thought of his train and was faithful to his duty.

There is no evidence tending to establish contributory negligence on the part of plaintiff, and the judgment below is affirmed.

No error.